# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Steven C. Rodgers,                              Civil No. 09-1214 (DWF/SRN)

      Plaintiff,

    v.                                      **REPORT AND RECOMMENDATION**

Michael Astrue, Commissioner
of Social Security,

      Defendant.

_____

Ethel Schaen Esq., 1821 University Avenue, Suite 344 North, Saint Paul, Minnesota 55104, and Thomas A. Krause, Esq., Thomas A. Krause, P.C., 701 34th Place, West Des Moines, Iowa 50265, on behalf of Plaintiff.

Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Steven Rodgers seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for supplemental security income ("SSI"). The parties have filed cross-motions for summary judgment, [Doc. Nos. 10 and 13], and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment be granted in part and denied in part, and Defendant's motion for summary judgment be denied.

# I.  BACKGROUND

## A.  PROCEDURAL HISTORY

Plaintiff Steven Rodgers protectively filed an application for SSI on February 24, 2006. (Doc. 9-5, at 2-4.)[1]  He alleged a disability onset date of November 26, 2003, due to high blood pressure, dizziness, left arm pain, inability to use his left arm, depression, and borderline mental retardation.  (Doc. 9-5, at 2-4; Doc. 9-6, at 7, 50, 58-60.)  Plaintiff's application was denied initially and upon reconsideration.  (Doc. 9-3, at 2-6.)  Plaintiff requested a hearing before an Administrative Law Judge (ALJ), which was held on June 17, 2008.  (Doc. 9-4, at 12, Doc. 9-2, at 33-70.)  On October 17, 2008, the ALJ issued an unfavorable decision.  (Doc. 9-2, at 9-32.) The Appeals Council denied a request for further review on March 26, 2009.  (Doc. 9-2, at 2-6.) The denial of review made the ALJ's decision the final decision of the Commissioner.  See 42 U.S.C. § 405(g); Clay v. Barnhart, 417 F.3d 922, 928 (8th Cir. 2005); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).

## B.  FACTUAL HISTORY

Plaintiff was 43 years old on the date he filed his SSI application.  (Doc. 9-5, at 2; Doc. 9-6, at 7.)  He has relevant work history as an assembly line worker, laborer, and steel cutter. (Doc. 9-6, at 8.)  In 2003, Plaintiff, an innocent bystander, was shot in the left arm during a gang-related shooting.  (Doc. 9-7, at 3.)  He has not worked since that incident.  (Doc. 9-6, at 7.)

At the time of the administrative hearing, Plaintiff testified that he lived with his twenty-five-year-old son and was not working.  (Doc. 9-2 at 40.)  He went to school through the

---

[1]  The Administrative Record in this case, Docket No. 9, is only consecutively numbered for the first 111 pages.  Therefore, the Court will cite to the Administrative Record using the Docket number and the page number stamped on the document through the Court's electronic filing system, found at the top of the page.

eleventh grade, and did not read or write well. (<u>Id.</u> at 41.) After attending a treatment program in November 2003, Plaintiff testified he stopped using drugs and alcohol. (<u>Id.</u> at 42.) The ALJ noted, however, that a medical record in 2006 stated Plaintiff drank six beers at a time, two or three times per week. (<u>Id.</u> at 49-50.). Plaintiff agreed that statement was accurate for 2006, but stated he was no longer drinking. (<u>Id.</u>) Later in the hearing, upon questioning from Plaintiff's attorney, he stated he had not had anything to drink in at least two years. (<u>Id.</u> at 53.) Plaintiff further testified that he last used drugs in 2003. (<u>Id.</u>)

Plaintiff testified that he could walk approximately three blocks with his left hand in his pocket to support the weight of his arm. (<u>Id.</u> at 42.) He stated he could open and shut his left hand but could not write with a pencil in his left hand. (<u>Id.</u> at 43.) Because he could not use his left hand to get dressed, his grandson helped him tie his shoes and button his shirts. (<u>Id.</u> at 44.) Plaintiff could not use his left arm or hand to bathe himself or eat. (<u>Id.</u> at 44). Using his right hand, he could eat food that did not require much cutting. (<u>Id.</u>) Because of swelling, Plaintiff wore a sling at night. (<u>Id.</u> at 44-45.)

The ALJ questioned Plaintiff about an entry in the medical records in which Plaintiff refused to do a urinalysis. (<u>Id.</u> at 45.) Plaintiff explained that he went to see his doctor that day for arm pain, but his regular doctor was not available. (<u>Id.</u>) A registered nurse stated that Plaintiff could still take the urinalysis test, without seeing the doctor. (<u>Id.</u>). Plaintiff responded that he would come back when his doctor was available and take the urinalysis test at that time. (<u>Id.</u> at 45-46, 53.) The ALJ also questioned why Plaintiff missed three doctor appointments, thereby breaking his pain contract for narcotic prescriptions. (<u>Id.</u> at 46.) Plaintiff testified that he went to those appointments, but the doctor refused to see him because he was several minutes late. (<u>Id.</u> at 47.) He also denied giving a fake urine sample on another occasion. (<u>Id.</u> at 48.)

At the time of the hearing, Plaintiff was taking four or five Tylenol for pain, but he testified it did not help. (Id.) Additionally, Plaintiff put hot towels on his arm to alleviate the pain. (Id.) Plaintiff testified that when he used morphine previously, it did help his pain but often caused him to fall asleep. (Id. at 51.) Plaintiff described his pain as constant and testified that bending or lifting his arm made his pain worse. (Id.) Plaintiff testified that he could not lift anything with his left arm, not even a gallon of milk. (Id. at 52.)

Plaintiff noted that he was referred to a pain clinic in 2007, because he wanted to quit using the morphine. (Id. at 55-56). Through the pain clinic, the doctor prescribed plaintiff a seizure medication. (Id. at 55). Plaintiff testified he had a reaction to the medication and had to go to the emergency room. (Id. at 55, 58). Thereafter, he quit going to the pain clinic. (Id.)

In response to questions from his attorney, Plaintiff testified he was in special education or "slow classes" in school and he had received Ds and Cs for grades. (Id. at 50.) During the day, Plaintiff testified he spent time helping with his grandkids, going to the store, or going to a park to watch basketball or baseball games. (Id. at 52). He testified he did not do any cooking, cleaning, or shopping. (Id.) Mentally, Plaintiff described feeling sad because of his inability to work or care for himself. (Id.)

## C.     MEDICAL EVIDENCE IN THE RECORD

Upon a referral from his attorney, on October 28, 2005, Plaintiff underwent a psychological evaluation with Dr. Nicolette Puntini. (Doc. 9-7, at 2-13.) During the evaluation, he was cooperative, related in an appropriate manner, and his statements were relevant and coherent. (Id. at 3.) Plaintiff reported that he had dropped out of school in the tenth grade and had been in regular classes, but had learning difficulties in reading and math. (Id.)

Plaintiff reported that he was unable to work because of depression and a gunshot injury to his left arm that occurred in 2003. (Id.) His left elbow was shot when he was caught in the cross-fire of a gang shooting in Chicago. (Id.) He was hospitalized for a week, where he underwent surgery and his elbow was replaced with prosthetic material. (Id. at 3-4.) He told Dr. Puntini that his wound became infected after four weeks of physical therapy, and it was treated with antibiotics. (Id. at 4.) Plaintiff stated that since his gunshot injury, he could not bend his left arm or grasp with his left hand, and frequently suffered left shoulder pain. (Id. at 4.) He took Advil or Motrin, every day, for his pain. (Id.) Plaintiff, who was left hand dominant, reported difficulties with daily activities because of his arm limitations. (Id.) He had difficulties cooking and cleaning, such as using a broom, opening jars, and picking up a pan. (Id.) Because of his injury, Plaintiff lost his job as a car wash attendant and could not perform any other manual labor. (Id. at 5.) His prior employment history involved temporary manual labor jobs. (Doc. 9-7, at 7-8, Doc. 9-6, at 17.) Plaintiff also reported being unable to do other activities he had enjoyed, such as playing with his grandchildren, mowing the lawn, and doing car repairs. (Id. at 5).

After being shot, Plaintiff became depressed because of his physical limitations. (Id. at 5.) However, he also reported feelings of personal inadequacy even before his injury, due to his limited education and reading ability. (Id. at 5.) He had difficulty sleeping and concentrating due to interfering depressive thoughts. (Id. at 6.) Additionally, Plaintiff reported that his energy and motivational levels were low, he had a low tolerance for frustration, and he suffered from pronounced irritability. (Id.) Dr. Puntini noted Plaintiff had a history of alcohol, marijuana, and cocaine use. (Id.) In March 2003, Plaintiff completed an outpatient substance abuse treatment program. (Id.) However, Plaintiff continued to use alcohol and marijuana after treatment. (Id.)

After being shot, Plaintiff became "motivated" and stated he had completely abstained from alcohol and drugs. (Id.) Plaintiff reported a criminal history, including a 2002 conviction for cocaine possession, for which he served six months in jail. (Id. at 6-7.)

During the psychological evaluation, Plaintiff took the WAIS-III intelligence test and scored a full-scale score of 70, a verbal score of 73, and a performance score of 72. (Id.) He had difficulty with some of the performance-related tests due to his inability to use his left hand, which Dr. Puntini believed may have resulted in underestimating some of his subtest scores. (Id. at 8-9.) Nonetheless, Dr. Puntini opined that Plaintiff's actual level of intelligence appeared to fall within the borderline range. (Id. at 9.) Plaintiff's arithmetic ability was very poor, and his short-term memory was average. (Id. at 9-10.) Plaintiff's overall perceptual-related intellectual functioning was in the borderline range. (Id. at 10.)

On the WRAT-3 test, Plaintiff's reading skills were measured at the third grade level, and his spelling skills at the second grade level. (Id.) Plaintiff reported that his limited reading and spelling skills caused problems throughout his lifetime, including filling out job applications, reading labels at grocery stores, and traveling to unfamiliar places. (Id. at 10-11.) Plaintiff also took the WMS-R memory test and exhibited some moderate deficits. (Id. at 12.) Finally, Plaintiff was administered the Beck Depression Inventory, during which he needed assistance reading test items. (Id.) He endorsed test items consistent with severe depression. (Id.)

Ultimately, Dr. Puntini diagnosed Plaintiff with dysthymic disorder, polysubstance abuse-reportedly in full remission, borderline intellectual functioning, and a GAF score of 50.[1]

---

[1] A Global Assessment of Functioning (GAF) score is a doctor's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders Text Revision, 32-34 (4th ed. 2000). A GAF below 50 is indicative of a severe impairment and "serious limitations in the patient's general ability to perform basic tasks of daily life." Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003).

(Id. at 12.)   Dr. Puntini opined that, functionally, Plaintiff could understand and remember simple instructions, but his ability to maintain concentration, persistence, and pace for routine job demands would be impaired due to "depressive ruminations and his other psychological problems."   (Id.)   She further stated, "[h]is social withdrawal, irritability, and feelings of personal inadequacy would interfere with his ability to maintain occupational relationships with the general public, coworkers, and supervisors on a sustained basis."   (Id.)   Dr. Puntini also completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique Form on Plaintiff's behalf and opined that he met listing 12.04 for dysthymic disorder with marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace.  (Id. at 18-31.)

On February 14, 2006, Plaintiff visited a nurse through the Access Community Health Network, and complained he had been experiencing dizziness for two weeks.  (Doc. 9-7, at 32.) Plaintiff admitted to drinking two beers a week and smoking marijuana twice a week.   (Id.) Plaintiff was prescribed Antivert and told to quit smoking. (Id.)

Plaintiff underwent a consultative psychiatric evaluation with Dr. Herman Langner, a state agency medical consultant, on May 17, 2006.  (Id. at 36-38.)  Dr. Langner noted Plaintiff had a good attitude and was cooperative.  (Id. at 36.)  At that time, Plaintiff lived with his mother and sat around a lot, not doing much.  (Id.)  The doctor stated, "[h]e does not appear to be able to take care of basic activities of daily living."  (Id.)  Dr. Langner noted Plaintiff's previous use of marijuana and cocaine, and his past rehabilitation treatment.  (Id.)  On mental status examination, Plaintiff could repeat a series of four numbers forward but could not repeat a series of three numbers backward.  (Id.)  He could recall one out of three items after three minutes.  (Id.) Plaintiff incorrectly stated that Clinton was the president, could not name five large cities, could

not state how many weeks in a year, and could not state how many nickels in $1.15. (Id.) He could not multiply four times nine, could not do serial sevens, and could not interpret proverbs. (Id. at 38.) Dr. Langner diagnosed dysthymic disorder and borderline mental retardation, and assessed a GAF score of 35-40. (Id.)

On June 27, 2006, Dr. Terry Travis completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Id. at 39-52.) Dr. Travis found Plaintiff to meet the "A" criteria for Listing 12.02 Organic Mental Disorders and 12.04 for Affective Disorders. (Id. at 39.) Under the "B" criteria of the Listings, Dr. Travis opined that Plaintiff had moderate restrictions in the activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Id. at 49.) Dr. Travis did not find Plaintiff to be markedly limited in any mental functional area on the Mental Residual Functional Capacity Assessment form. (Id. at 53-54.) Dr. Travis opined that Plaintiff could learn simple instructions, relate appropriately and adapt reasonably well to circumstances, function consistently at a reasonable rate within his physical limitations, and do one to two step tasks that could be learned within a month. (Id. at 55.) Ray Conroe, P.H.D, L.P., affirmed the opinion of Dr. Travis on October 23, 2006. (Id. at 80-82).

On July 6, 2006, Plaintiff underwent a physical examination with Dr. Stanley Rabinowitz, a state agency consultant. (Id. at 57-60.) Dr. Rabinowitz noted Plaintiff's history of a gunshot wound to the left extremity in 2003, requiring open reduction and internal fixation of the left elbow and left humerus fractures. (Id.) Dr. Rabinowitz also noted that Plaintiff complained of constant pain in the left elbow and forearm, with limited range of motion of the left elbow, and "no use" of the left arm. (Id.) Dr. Rabinowitz reported that, at that time, Plaintiff

did not take medication for pain relief. (Id.) He also noted that Plaintiff smoked cigarettes and drank six beers, two or three times per week. (Id. at 58.)

On examination, Plaintiff had limited range of motion in the left shoulder, left elbow, and left wrist. (Id. at 59.) His left hand grip strength was 50%, "with the patient allegedly unable to oppose the left thumb to the fingers of the left hand." (Id.) Dr. Rabinowitz noted, "the patient would not perform grip strength greater than 50% of normal in the absence of objective findings to demonstrate why grip strength in the left hand was impaired." (Id. at 60.) Dr. Rabinowitz also noted there was "no evidence of intrinsic muscle atrophy or synovitis." (Id. at 59.) Plaintiff could not pronate or supinate the left forearm. (Id.) On a scale of one to five, Plaintiff's grip strength in his right hand was five out of five and his left hand was two point five out of five. (Id.)

Neurologically, Plaintiff had decreased pinprick sensation to the palm of the left hand with dysesthesias of the remaining left upper extremity. (Id.) Reflex testing was normal. (Id.) Motor strength testing indicated moderate motor weakness and atrophy of the proximal left upper extremity to the left forearm. (Id.) The remaining motor strength testing was normal. (Id.) On mental status examination, Plaintiff was fully oriented, his memory was intact, and appearance was appropriate. (Id. at 60.) Plaintiff did not exhibit any behavioral difficulties. (Id.) In summary Dr. Rabinowitz stated, "[c]learly there is impaired range of motion testing on examination of the left elbow with inability to pronate and supinate the left forearm. There was also impaired range of motion testing of a mild degree of the left shoulder and left wrist." (Id.) Dr. Rabinowitz diagnosed post traumatic arthritis in Plaintiff's left arm. (Id.)

On July 19, 2006, Dr. Robert Patey completed a Physical Residual Functional Capacity Assessment form for Plaintiff at the request of the Social Security Administration. (Id.

at 62-69.)  He opined that Plaintiff could occasionally lift twenty pounds; frequently lift ten pounds; stand or walk six hours in an eight hour day; sit six hours in an eight hour day; never climb ladders, ropes or scaffolds; reach with limitations with his left arm; and avoid unprotected heights and hazardous machinery.  (Id. at 63-66.)  Ultimately, Dr. Patey concluded Plaintiff was capable of light work.  (Id. at 69.)  Dr. Gregory Salmi affirmed Dr. Patey's opinion on October 23, 2006.  (Id. at 78-79.)

Plaintiff visited the Hennepin County Medical Center "HCMC" walk-in clinic on September 21, 2006, after relocating to Minnesota from Chicago.  (Id. at 118).  He reported constant arm and bilateral shoulder pain for the last three years as well as, a headache with some blurry vision.  (Id.)  Plaintiff admitted to not taking his prescription for high blood pressure because he had insurance problems.  (Id.)  On examination, Plaintiff's shoulder range of motion was not restricted, but he complained of pain on movement.  (Id.)  Dr. Farah Momen diagnosed biceps tendinitis as opposed to frozen shoulder.  (Id. at 118-19.)  She prescribed Dyazide for Plaintiff's hypertension and recommended exercise and ibuprofen.  (Id. at 119.)

Plaintiff then went to the HCMC Medicine Clinic to establish primary care on October 30, 2006.  (Id. at 115.)  Plaintiff reported to Dr. Melody Mendiola that he had managed his pain for the past three years with intermittent over-the-counter NSAID medications.  (Id. at 115.)  Because he did not have insurance, however, his pain and medications had not really been evaluated.  (Id.)  Plaintiff reported little relief from the exercises recommended to him in the walk-in clinic, and he was unable to afford the ibuprofen at the recommended dose.  (Id. at 115-16).  Plaintiff rated the pain in his left forearm as ten out of ten and stated the pain was exacerbated by cold weather.  (Id. at 116.)  On examination, Plaintiff was alert, oriented, and in no apparent distress.  (Id. at 116.)  He exhibited severely limited range of motion in his left arm

and slightly limited range of motion in his shoulder.  (Id.)  His strength and sensation were normal and his grip strength was intact bilaterally.  (Id. at 116-17.)  Dr. Mendiola concluded Plaintiff's shoulder pain was consistent with bilateral frozen shoulder.  (Id. at 117).  For treatment she recommended continued exercise, physical therapy, and an orthopedic evaluation. (Id.)  She also diagnosed chronic pain syndrome and recommended a nonsteroidal anti-inflammatory medication because Plaintiff did not want to take prescription pain medication. (Id.)  She noted that she filled out Plaintiff's General Assistance paperwork.  (Id.)  For Plaintiff's hypertension, Dr. Mendiola continued him on Dyazide and added Atenolol.  (Id.)  Plaintiff attended physical therapy at HCMC for ten sessions in November and December 2006.  (Id. at 83.)

On referral from Dr. Mendiola, Plaintiff visited the HCMC Orthopedic Clinic for evaluation on November 27, 2006.  (Id. at 114.)  On examination, Dr. Janet Uhde noted Plaintiff could not extend his left arm to neutral, and could only flex to 40 degrees and supinate to 45 degrees.  (Id.)  Dr. Uhde noted Plaintiff could reach overhead bilaterally, with even strength. (Id.)  Plaintiff complained of numbness in the left hand and was unable to fully extend his wrist. (Id.)  Dr. Uhde recommended continued physical therapy and prescribed Neurontin.  (Id. at 114-115.)

Plaintiff had CT scans of both shoulders on November 27, 2006.  (Id. at 101-104.)  The scan of the right shoulder showed no fractures or subluxation and the joint was within normal limits.  (Id. at 101.)  The scan did show arthritic changes to the acromioclavicular joint.  (Id.) The scan of the left side showed the sideplate and screws in Plaintiff's left humerus, and arthritic changes to the acromioclavicular joint.  (Id. at 101-02.)  A CT scan of Plaintiff's left forearm showed metallic fragments scattered throughout Plaintiff's arm, consistent with his gunshot

wound injury.  (Id. at 103.)  The fragments from Plaintiff's fractured humerus were well-aligned with no evidence the hardware, sideplate, or screws were loosening.  (Id.)

Plaintiff returned to Dr. Mendiola for a follow-up examination on December 18, 2006. (Id. at 112-13.)  Rating his pain as a seven out of ten, Plaintiff reported he was tolerating the Neurontin, but it caused some mild dizziness.  (Id.)  Dr. Mendiola noted that Plaintiff's orthopedist had increased his Neurontin dose.  (Id.)  Plaintiff also reported that the stiffness in his shoulders was improving with physical therapy.  (Id.)  On physical examination, he was alert and oriented, in no apparent distress.  (Id. at 112-13.)  Dr. Mendiola noted that she completed General Assistance paperwork for Plaintiff, stating that in February he could start to do limited work, twenty hours per week, but no lifting with the left arm.  (Id. at 113.)

On January 29, 2007, Plaintiff saw Dr. Thomas Varecka at the HCMC Orthopedic Clinic. (Id. at 110.)  Because of his continuing arm pain, Plaintiff requested narcotic pain medication at that visit.  (Id.)  Dr. Varecka noted that follow-up CT scans in January 2007 showed extensive plate and screw fixation and a supracondylar humerus nonunion.  (Id. at 96-100, 111.)  On examination, Plaintiff had weakness in his left arm and wrist, and significantly diminished left elbow range of motion.  (Id. at 111.)  Dr. Varecka did not feel Plaintiff's left upper extremity symptoms were all related to the supracondylar nonunion, and for that reason, and because of risk of nerve injury, Dr. Varecka did not recommend surgery.  (Id.)  Instead, he recommended a referral to a pain management clinic, and prescribed Tramadol (also called Ultram).  (Id.) Finally, Dr. Varecka stated that Plaintiff could proceed with activities as tolerated.  (Id.)

Complaining that his pain medications were not helping, Plaintiff returned to Dr. Mendiola on February 7, 2007.  (Id. at 108-09.)  On examination, Plaintiff had decreased range of motion in the left elbow, some swelling in the left forearm and left hand, and decreased

strength.  (Id.)The doctor diagnosed chronic pain syndrome secondary to Plaintiff's arm injury and the nonunion of his fracture.  (Id. at 109.)  After Plaintiff agreed to sign a pain medication contract, Dr. Mendiola prescribed MS Contin and Vicodin and referred Plaintiff to the Pain Management Clinic through the Courage Center.  (Id.)

On May 3, 2007, Plaintiff went to HCMC for a nurse visit for refills of his Vicodin and Morphine.  (Id. at 90).  After speaking with Dr. Mendiola, Nurse Marino told Plaintiff he could not get refills of the narcotics until he saw Dr. Mendiola because he had missed too many appointments under the pain medication contract.  (Id.)  Further, the doctor stated that Plaintiff needed to have a urine toxicology screen that day if he wanted to receive narcotic pain medication at his next visit.  (Id. at 90-91.)  Plaintiff refused the urine toxicology screen, stating he did not have time.  (Id.)  Because of the missed appointments and his refusal to take the urine test, Dr. Mendiola noted she would no longer be prescribing long-term narcotics.  (Id.)

At his next appointment, on June 14, 2007, Dr. Mendiola noted Plaintiff was in obvious distress over his arm pain.  (Id. at 92-93).  Dr. Mendiola again referred Plaintiff to the pain clinic through Hennepin Faculty Associates, noting that the Courage Center pain clinic never called Plaintiff after the doctor's previous referral.  (Id. at 92-93).  Because Plaintiff broke the pain medication contract, the doctor refused to give Plaintiff narcotic medications.  (Id.)  Plaintiff stated that he missed the previous appointments because he was not aware of those appointments.  (Id.)

Plaintiff returned to HCMC on December 19, 2007, and reported to Dr. Mendiola that his left arm pain was much worse.  (Id. at 93-95.)  Plaintiff reported that, when he went to Chicago for Thanksgiving, a doctor prescribed him pain medications.  (Id. at 94.)  Plaintiff told the doctor he was not specifically interested in narcotics, he "just wanted the pain to go away."  (Id.)

Plaintiff told the doctor that Ibuprofen, Tylenol, Neurontin and Tramadol did not alleviate his pain. (<u>Id.</u> at 94-95.) On examination, Plaintiff's mood was good, his affect was appropriate, and strength and sensation were grossly intact. (<u>Id.</u> at 95). Dr. Mendiola was concerned that Plaintiff gave a false urine sample that day because, although the doctor showed Plaintiff to the restroom, he was later seen coming from the waiting room area holding his urine sample. (<u>Id.</u>) Because of that concern, coupled with Plaintiff's previous missed appointments and refusal to give a urine sample, she would not prescribe Plaintiff narcotics. (<u>Id.</u>) She expressed concern that Plaintiff had a recurrence of his substance abuse problems. (<u>Id.</u>) Once again, Dr. Mendiola referred Plaintiff to a pain clinic. (<u>Id.</u>)

Plaintiff was evaluated at North Memorial Health Care's pain clinic on October 1, 2008 by Certified Nurse Practitioner Patricia Tomshine and Dr. James Anderson. (<u>Id.</u> at 128-29.) After noting Plaintiff's medical history and past pain treatments, the nurse suggested to Plaintiff that he might be a good candidate for injection therapy or a spinal cord stimulator. (<u>Id.</u> at 129). Plaintiff then abruptly stood up and left the clinic, stating "I don't want any needles." (<u>Id.</u>)

Plaintiff returned to the North Memorial pain clinic on November 3, 2008. (<u>Id.</u> at 126-27.) On that visit, Plaintiff rated his constant pain at a level of nine out of nine and reported he could not sleep because of the pain. (<u>Id.</u>) On examination, Plaintiff's motor strength was slightly decreased in the left upper extremity, but sensation was intact. (<u>Id.</u> at 126.) Plaintiff could not fully extend his left elbow but had normal range of motion in the left shoulder. (<u>Id.</u>) Dr. James Anderson prescribed Lyrica for Plaintiff's pain and recommended physical therapy. (<u>Id.</u> at 127.)

Plaintiff was evaluated for physical therapy at Medical Pain Clinics ("MAPS") on November 14, 2008. (<u>Id.</u> at 124-25.) At that time, Plaintiff reported his left arm pain was at a

level of nine out of ten.  (Id.)  He stated that his pain increased with working, dressing, walking, lifting, and exposure to cold.  (Id. at 124).  Due to his pain and hypertonicity, Plaintiff's left shoulder range of motion was significantly limited in flexion, abduction and internal rotation. (Id.)  His left elbow range of motion was also limited, and his left elbow strength was limited to 3/5 flexion and 3+/5 extension.  (Id. at 125.)  Plaintiff also had weakness in his left arm due to his injury and pain.  (Id.)  Physical Therapist Kari Pedersen recommended a specific neuromuscular re-education program, including exercise and pool therapy.  (Id.)

On referral from Nurse Tomshine, Plaintiff had a behavioral health evaluation with Psychologist Ronald Berk at MAPS on November 19, 2008.  (Id. at 120-23.)  Plaintiff reported constant left arm pain, shoulder pain, and head and lower back pain in the areas where he had been stabbed by his ex-fiancée.  (Id. at 120-21.)  While Plaintiff's intelligence was not formally tested at the appointment, Mr. Berk believed Plaintiff appeared developmentally disabled.  (Id. at 121.)  On mental status examination, Plaintiff's mood appeared to be moderately to severely depressed with some anxiety.  (Id. at 122.)  Plaintiff reported not wanting to socialize or be around people since he was shot.  (Id.)  Mr. Berk diagnosed pain disorder associated with both psychological factors and a general medical condition; major depressive disorder, single episode, moderate; post traumatic stress disorder; mild retardation; and chronic pain, with a GAF score of 45.  (Id.)  Mr. Berk recommended additional psychological evaluation and psychotherapy.  (Id. at 122-23.)

### D.    EVIDENCE FROM THE MEDICAL EXPERT

Dr. Mary Louise Stephens, a licensed psychologist, testified at the administrative hearing as a medical expert.  (Doc. 9-4 at 38).  Dr. Stephens noted that Plaintiff had been diagnosed with dysthymia, but he did not receive any mental health treatment.  (Doc. 9-2, at 60.)  Dr. Stephens

opined that there was insufficient evidence to establish that Plaintiff met the listing for dysthymia, or any other mental impairment, because Plaintiff did not seek any treatment and never took medications for depression.  (Id. at 61-62).

The ALJ then questioned Dr. Stephens about Plaintiff's intelligence, noting that one social security report limited Plaintiff to work involving one and two step tasks.  (Id. at 62).  Dr. Stephens responded that Plaintiff had performed work that involved more than one or two steps in the past.  (Id. at 62-63.)  On questioning from Plaintiff's attorney, however, Dr. Stephens agreed with the diagnosis of borderline intellectual functioning and said she saw nothing to suggest the IQ scores were invalid.  (Id. at 63.)  She also agreed that Plaintiff's test results indicated Plaintiff read at a third grade level.  (Id.)

### E.    EVIDENCE FROM THE VOCATIONAL EXPERT

A vocational expert ("VE"), Steve Bosch, also testified at the January 16, 2008 administrative hearing.  (Id. at 64-69.)  The ALJ asked Bosch to consider an individual of Plaintiff's age and educational background, with a history of substance abuse, borderline intellectual functioning, status post gunshot wound and fracture, non union of the humerus, arthritic pain, hypertension, chronic pain syndrome, decreased flexion in the left elbow, shoulder and wrist, who could perform light work, modified by precluding the use of ladders, ropes and scaffolds, with limited overhead reaching with the left arm, limited from working around unprotected heights or unprotected hazards, and limited to work with one and two step instructions that could be learned within one month.  (Id. at 66-68.)  In response to this hypothetical, Mr. Bosch opined that such a person could not perform Plaintiff's previous work, because of Plaintiff's physical limitations, including the limitation that the jobs require only one and two step tasks.  (Id. at 67-68.)  The ALJ then asked whether there was any other work such a

person could do in the regional or national economy.  (Id. at 68.)  Bosch responded that such a person could perform some assembly work, light janitor or cleaner work, and work as a molding machine operator.  (Id. at 68.)  Bosch also testified that, if the hypothetical person also could not use their dominant arm, then there would be no work such a person could perform.  (Id.)

## F. THIRD-PARTY OBSERVATIONS

Plaintiff's brother, Ricky Rodgers, completed a "Function Report-Adult Third Party" form for the Social Security Administration in support of Plaintiff's claim for disability.  (Doc. 9-6, at 25-32.)  Mr. Rodgers stated that Plaintiff sat around during the day watching television because he could not work.  (Id. at 25.)  He indicated that Plaintiff had arm pain all of the time, and he could not use his left arm.  (Id. at 26.)  In terms of Plaintiff's ability to care for himself, Mr. Rodgers stated that Plaintiff could feed himself but needed some help with dressing and grooming.  (Id.)  Mr. Rodgers stated that Plaintiff did not need reminders to take his medication, and he could prepare his own simple (frozen) meals.  (Id. at 26-27.)  Additionally, he indicated that Plaintiff could not do housework or yard work, but he could walk and shop for food.  (Id. at 27-28.)  Mr. Rodgers stated that Plaintiff "very often" spent time on the phone, and visited family on a regular basis.  (Id. at 28.)  Mr. Rodgers also stated that Plaintiff's arm injury made it difficult for him to lift things, reach things, and use his hand.  (Id. at 29).  Mr. Rodgers stated that Plaintiff could pay attention, he finished what he started, he could not read, he followed spoken instructions well, and he got along well with authority figures.  (Id.)  Finally, he indicated that Plaintiff handled stress and changes in routine "o.k."  (Id. at 30.)

## G. THE ALJ'S DECISION

The Administrative Law Judge (ALJ), Roger Thomas, concluded Plaintiff was not disabled within the meaning of the Social Security Act.  (Id. at 9-2, at 31-32.)  The ALJ

employed the required five-step sequential evaluation in his opinion: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant was capable of returning to past work; and (5) whether the claimant could do other work existing in significant numbers in the regional or national economy. 20 C.F.R. § 404.1520(a)-(f).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 24, 2006. (<u>Id.</u> at 16.) At step two, the ALJ found that Plaintiff had severe impairments of a gunshot wound to the left upper extremity in 2003, status post open reduction and internal fixation of the left elbow and left humerus fractures, history of substance abuse, dysthymia, and borderline intellectual functioning. (<u>Id.</u> at 17). The ALJ did not include hypertension as one of Plaintiff's impairments because it did not limit Plaintiff's ability to do basic work activities. (<u>Id.</u> at 18.)

At the third step of the evaluation process, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (<u>Id.</u> at 18.) Evaluating Plaintiff's mental impairments, the ALJ found that Plaintiff's depression did not meet or medically equal listing 12.04 (affective disorders) or 12.09 (substance addiction disorders) because he did not exhibit marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. (<u>Id.</u> at 19.) The ALJ reasoned that Plaintiff's activities of daily living and social functioning were only mildly restricted because Plaintiff testified that he lived with his son, took his grandchildren to the store, the park, and

basketball games, made simple meals, visited his family, spent time on the phone, and went shopping.  (Id. at 19-20.)  Next, the ALJ considered Plaintiff's GAF scores of 35-40 in May 2006, and 50 in October 2005.  (Id. at 20.)  The ALJ did not give the GAF scores significant weight because they only reflected the claimant's functioning at a specific time and not over an extended period.  (Id.)  The ALJ also noted that Plaintiff did not have a history of significant isolation or history of job losses due to social difficulties, he had a close relationship with his family, he could go out by himself, and Plaintiff's brother indicated Plaintiff got along well with others.  (Id.)  The ALJ further stated that Plaintiff's treating and examining physicians found him to be pleasant and cooperative.  (Id.)  The ALJ acknowledged that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace, but concluded those difficulties did not rise to the level of a marked impairment.  (Id. at 20-21.)  The ALJ noted that psychological testing revealed Plaintiff had borderline intellectual functioning, but the ALJ did not find marked limitations in functioning because Plaintiff's short-term memory was average, with moderate deficits in intermediate verbal memory and immediate perceptual memory.  (Id. at 21.)  He also noted Plaintiff used public transportation by himself, and Plaintiff's brother indicated Plaintiff could pay attention, handle stress, handle changes in routine, follow spoken directions well, and did not need reminders to take his medication.  (Id.)  Finally, the ALJ concluded Plaintiff did not have any episodes of decompensation, and there was no evidence of the "C criteria" of the listings.  (Id. at 22.)

At step four of the disability evaluation, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 416.967(b), which did not require climbing ropes, ladders or scaffolds, which allowed for a limited use of the left arm, including limited overhead reaching, which did not involve unprotected heights or hazards, and

which was limited to one to two step tasks that could be learned within a month. (<u>Id.</u> at 22.) In formulating this RFC, the ALJ considered Plaintiff's subjective complaints, and the report from Plaintiff's brother. (<u>Id.</u>) The ALJ found the brother's testimony to be essentially consistent with Plaintiff's assertions, but the ALJ "gave greater weight to the overall evidence of record." (<u>Id.</u>) The ALJ concluded Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (<u>Id.</u>). The ALJ stated that he gave the greatest weight to the opinions of the DDS psychological consultants who found Plaintiff capable of one to two step tasks, and the opinions of the state agency consultants concerning Plaintiff's physical limitations. (<u>Id.</u> at 25.)

The ALJ gave the following explanation for his RFC determination. In Plaintiff's July 2006 consultative examination, Plaintiff had impaired range of motion of the left elbow and moderate motor weakness on the left, but normal muscle tone and only mild atrophy due to disuse, mild impairment on sensory examination, and range of motion testing on the left wrist and shoulder which indicated only mild impairment. (<u>Id.</u> at 25-26.) The ALJ also noted the consultative examiner did not find any objective reason for an impairment to Plaintiff's left hand grip strength. (<u>Id.</u> at 26.) The ALJ described the objective medical evidence at length and explained his conclusion that the medical evidence did not support the allegedly disabling conditions. (<u>Id.</u> at 25-26). The ALJ also found that, for the most part, Plaintiff used only over-the-counter pain medications, which was inconsistent with disabling pain. (<u>Id.</u> at 26.)

With respect to Dr. Puntini, the ALJ gave little weight to her opinion because he concluded the opinion was inconsistent with other evidence in the record and based primarily on

Plaintiff's subjective assertions of disability.  (Id. at 27-28.)  He also found Dr. Puntini's opinion that Plaintiff's depression would interfere with his ability to work or to maintain concentration, persistence, and pace internally inconsistent with her opinion that Plaintiff could carry out simple instructions.  (Id. at 28.)  Likewise, the ALJ found Dr. Puntini's opinion was inconsistent with Plaintiff's mental health care because he was not receiving any mental health treatment.  (Id.)  In further analyzing Plaintiff's credibility, the ALJ noted Plaintiff did not engage in any substantial gainful activity during the past fifteen years, which did not evidence a significant motivation to return to employment.  (Id.)

At step five of the analysis, the ALJ concluded that Plaintiff could not perform his past relevant work.  (Id. at 29.)  Based on the vocational expert's testimony in response to a hypothetical question incorporating Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff could perform other work that exists in significant numbers in the national economy including jobs as an assembly worker, janitor, and a molding machine operator.  (Id. at 30.)  Thus, the ALJ found that Plaintiff was not disabled as defined in the Social Security Act.  (Id. at 31.)

## II.    **STANDARD OF REVIEW**

Congress has prescribed the standards by which disability benefits may be awarded.  "The Social Security Program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  A person is disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  20 C.F.R. § 416.905(a).  The claimant's impairments must be of such severity that he is not only unable to do

his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. Id. The impairment must have lasted or be expected to last for a continuous period of at least twelve months, or be expected to result in death. Id. § 423(d)(1)(A).

## A.    ADMINISTRATIVE REVIEW

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. § 416.1407-08. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. Id. at § 416.1430. If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic. Id. at § 416.1467. The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 1383(c)(3); 20 C.F.R. § 416.1481.

## B.    JUDICIAL REVIEW

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole. Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005); Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding." Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980). Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.  The credibility findings made by the ALJ;
2.  The plaintiff's vocational factors;
3.  The medical evidence from treating and consulting physicians;
4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
5.  Any corroboration by third parties of the plaintiff's impairments; and
6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Johnson v. Chater, 108 F.3d 942, 944 (8th Cir. 1997) (citing Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir 1989) (quoting Brand, 623 F.2d at 527)). A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion. Tellez, 403 F.3d at 956; Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). If it is possible to reach two inconsistent positions from the evidence, and one of those positions represents the Commissioner's decision, the court must affirm the decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.   DISCUSSION

In the instant case, Plaintiff contends that the Commissioner's decision is erroneous in four ways. First, Plaintiff contends the ALJ erred by not finding that Plaintiff met Listing 12.05(C) for mental retardation. Second, Plaintiff argues the ALJ failed to provide sufficient reasons for rejecting Plaintiff's treating physician's opinion, and erred in relying on Dr.

Rabinowitz's opinion. Third, Plaintiff contends the ALJ's decision is not supported by substantial medical evidence from an examining source. Finally, Plaintiff contends the ALJ's RFC assessment and the hypothetical questions posed to the vocational expert did not set forth all of Plaintiff's limitations.

This Court recommends that the district court find that: (1) the ALJ erred by not addressing whether Plaintiff met or equaled Listing 12.05(C); (2) the ALJ properly weighed the medical opinions; (3) the ALJ's RFC finding is supported by substantial evidence in the record; and (4) the hypothetical question posed to the vocational expert was proper. For these reasons, the Court recommends that the case be remanded back to the Commissioner for the sole purpose of making a determination as to whether Plaintiff met or equaled listing 12.05(c).

### A.      LISTING 12.05(C)

Plaintiff first contends that he raised the issue of meeting Listing 12.05(C) for mental retardation at the hearing, but the ALJ failed to address the listing in his decision. In response, Defendant argues that it is Plaintiff's burden to prove that he met Listing 12.05(C), and he failed to present evidence on one requirement of the listing, that is, adaptive deficits prior to age 22.

The administrative hearing is not an adversarial proceeding. Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994). Therefore, an ALJ is obligated to fully and fairly develop the record, even in cases such as this where the Plaintiff is represented by counsel. Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008); Delarosa v. Sullivan, 922 F.2d 480, 485 (8th Cir. 1991); Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994). The ALJ, however, is not required to investigate a claim not presented at the time of the application for disability benefits and not raised at the hearing. Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003); Peña v. Chater, 76 F.3d 906, 909 (8th Cir. 1996). There is no bright-line rule to determine when the record has been adequately developed

and that determination is made on a case-by-case basis.  <u>Mouser</u>, 545 F.3d at 638; <u>Battles</u> 36 F.3d at 45.   At the administrative hearing, Plaintiff's counsel put the ALJ on notice that Plaintiff's possible mental retardation under Listing 12.05(C) was at issue.  The ALJ therefore, should have addressed that listing in his analysis.

A plaintiff has the burden of proof to establish that he or she meets or equals a listed impairment.  <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530-31, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990)).   A listing is met only when the impairment meets all of the specified requirements of the listing.  <u>Id.</u>  If a claimant establishes that he either met or equaled a listing, he has established disability, and no further analysis is required.  20 C.F.R. § 416.925(a).

The introduction to the listings for mental disorders provides that:

> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation.  It also contains four sets of criteria (paragraphs A through D).  If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the Social Security Administration] will find that your impairment meets the listing.

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00.  The introductory paragraph for Listing 12.05 provides, "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.  The Eighth Circuit has explained, "to meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function."  <u>Maresh v. Barnhart</u>, 438 F.3d 897, 899 (8th Cir. 2006).  A claimant need not establish a formal diagnosis of mental retardation

to meet the Listing.  Id.  Absent any evidence of a change in a plaintiff's intellectual functioning, it is appropriate to assume that the plaintiff's IQ has not changed since his twenty-second birthday.  Id. (citing Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)).

With regard to a plaintiff's mental retardation and ability to work, the Eighth Circuit has stated, "the issue is not whether the claimant can perform gainful activity; rather, it is whether he has an . . .  impairment, other than his conceded mental impairment, which provides significant work-related limited function . . ."  Maresh, 438 F.3d at 901 (quoting Sird v. Chater, 105 F.3d 401, 403 (8th Cir.1997)).  An impairment imposes significant work-related limitations when its effect on a plaintiff's ability to perform basic work is more than slight or minimal.  Cook v. Bowen, 797 F.2d 687, 690 (8th Cir. 1986).  Where there is a finding that an additional physical impairment is severe, it automatically imposes significant work-related limitations.  Id.; see also Owens v. Shalala, 52 F.3d 330, 1995 WL 242339, *1 (8th Cir. 1995) (table decision).

In this case, Dr. Puntini's evaluation of Plaintiff's IQ and the medical expert's testimony establish that Plaintiff has a valid IQ score of 70, satisfying the first requirement of Listing 12.05(C).  (Doc. Nos. 9-7, at 8-9, 9-2 at 62-63).  The ALJ concluded that Plaintiff's left arm impairment was a severe impairment that prevented him from performing his past work.  (Doc. Nos. 9-2, at 17, 22, 29, 67-68).  Thus, Plaintiff has established the third requirement of 12.05(C), that he has a physical impairment that imposes an additional and significant work-related limitation of function.  The issue, therefore, is whether Plaintiff satisfied the second requirement of the listing, that is, evidence of deficits in adaptive functioning with an onset of impairment before age 22.

Plaintiff contends that evidence of his difficulties in reading, spelling, math, and his academic and vocational history establish that he had deficits in adaptive functioning prior to the

age 22.  Defendant contends Plaintiff has not established such deficits because he did not submit school records to support his academic problems, he told some medical providers that he was in mainstream classes in school, and he performed work involving more than two-step tasks.  In Maresh, the court concluded there was sufficient evidence that the plaintiff had deficits in adaptive functioning before age twenty-two because the plaintiff struggled in special education classes through the ninth grade.  Maresch, 438 F.3d at 899.  Similarly, in Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007), the court held the plaintiff met the burden of establishing deficits in adaptive functioning before the age of twenty-two because of evidence in the record of the plaintiff's early drop-out from school and special education classes.  Id.  However, at least one court has stated that an ALJ may consider a claimant's employment in a semi-skilled job as one factor in determining whether the claimant has shown deficits in adaptive functioning.  Cheatum v. Astrue, No. 07-4204, 2008 WL 4371489, *2 n.2 (W.D. Mo. Sept. 19, 2008).

There is at least some evidence in the record that Plaintiff had reading difficulties and was in special education classes and that he dropped out of high school.  Further, there is evidence in the record that Plaintiff currently reads at a third grade level, spells at a second grade level, and has a spotty work history of temporary, manual labor.  Thus, there is some evidence suggesting Plaintiff could satisfy the second requirement of Listing 12.05(C), and the ALJ erred by not considering that listing in his analysis.  Therefore, it is recommended that the case be remanded to the Commissioner for the ALJ to consider whether Plaintiff has deficits in adaptive functioning that manifested before the age of 22.  Although this Court recommends remanding this case because of the ALJ's error at step three of the disability evaluation process, the Court will nevertheless address Plaintiff's arguments at steps four and five of the evaluation process.

## B.    WEIGHT GIVEN TO MEDICAL OPINIONS

The Plaintiff alleges several errors in the weight the ALJ gave to the various medical opinions in the record.  First, Plaintiff asserts the ALJ erred by failing to articulate adequate reasons for rejecting the opinion of Plaintiff's treating physician, Dr. Mendiola.  Dr. Mendiola opined that Plaintiff was unable to work for several years, and could only work fewer than 20 hours a week with no lifting.  Plaintiff further argues that the record as a whole suggests Dr. Mendiola believed Plaintiff's disability lasted more than twelve months, and she simply wanted to reevaluate his situation after three months.  Plaintiff also contends the ALJ erred by relying on the opinion of Dr. Rabinowitz, who examined Plaintiff only once, and on the opinions of the non-examining state agency consultants, Drs. Patey and Salmi.  Plaintiff argues Drs. Patey's and Salmi's opinions should be rejected because, at the time they were given, they were not aware of the nonunion of Plaintiff's left humerus.  Finally, Plaintiff contends Dr. Mendiola was the only examining physician to report on his physical impairments, and the ALJ's disregard of Dr. Mendiola's opinion leaves no medical evidence in the record on the issue.  In response, Defendant contends Dr. Mendiola only placed a three month restriction on Plaintiff's work abilities, thus, her opinion does not support disability.  Defendant also points out that Dr. Varecka opined that Plaintiff's nonunion of the humerus was not the cause of Plaintiff's arm symptoms.

A physician's opinion is typically entitled to controlling weight if it is "well-supported" by medically acceptable clinical and laboratory and diagnostic techniques and not inconsistent with other substantial evidence in the record.  Leckenby v. Astrue, 487 F.3df 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 110, 1012-1013 (8th Cir. 2000.))  "An ALJ may discount such an opinion if other medical assessments are supported by superior medical

evidence, or if the treating physician has offered inconsistent opinions." Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). An ALJ may reject a treating physician's opinion when it is based primarily on the Plaintiff's subjective complaints. Quick v. Chater, 70 F.3d 1276, at *1 (8th Cir. 1995) (per curiam) (citing Janka v. Secretary of H.E.W., 589 F.2d 365, 369 (8th Cir. 1978) ("[T]he administrative law judge may give whatever weight he deems warranted to a physician's statements which are devoid of specific and complete clinical evidence.") (internal citation omitted.))

If an ALJ decides not to grant controlling weight to a treating physician's opinion, medical opinions are further evaluated under the framework described in 20 C.F.R. § 416.927(d). Under such framework, the ALJ should consider the following factors in according weight to medical opinions: (1) whether the source has examined the claimant; (2) the length of the treatment relationship and the frequency of examination; (3) the nature and extent of the treatment relationship; (4) the quantity of evidence in support of the opinion; (5) the consistency of the opinion with the record as a whole; and (6) whether the source is a specialist. Id. Generally, the opinion of a consulting physician who examines a claimant once is not substantial evidence. Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998). However, the Eighth Circuit has recognized that an ALJ may credit the opinion of a non-examining source over a treating physician if the consulting physician's assessment is supported by "better or more thorough medical evidence." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007)

Under this framework, this Court concludes that the ALJ properly weighed the medical opinions in this matter. The ALJ considered that Dr. Mendiola gave Plaintiff a three month work restriction in February 2007, but found the short-term restriction inconsistent with a disability lasting at least twelve months. (Id.) Dr. Mendiola stated that she was giving Plaintiff a work

restriction so Plaintiff would have time to get his pain under control, which suggests her restriction was based on Plaintiff's subjective complaint of pain. (Doc. No. 9-7, at 110.) The Court notes that Dr. Mendiola first saw Plaintiff in October 2006, almost three years after Plaintiff was shot in the left arm and had stopped working. Thus, Dr. Mendiola's statement that Plaintiff could not work for several years due to pain was not her objective opinion, but a report on Plaintiff's subjective complaints. (Doc. Nos. 9-7, at 112-17.) The ALJ properly analyzed and rejected Plaintiff's subjective complaints, based on Plaintiff's use of over-the-counter pain medications, and "spotty" work history over a 15 year period. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993) (failure to use prescription pain medication and spotty work history prior to onset of disability are negative credibility factors.) Because these short-term restrictions from Dr. Mendiola were based on Plaintiff's subjective reports of pain, rather than objective medical evidence, the ALJ did not err by discounting such restrictions.

Nor did the ALJ err by rejecting the opinion that Plaintiff was completely prohibited from using his left arm. In evaluating the medical evidence, the ALJ correctly noted that on physical examination in July 2006, there were no objective findings to indicate Plaintiff's grip strength was impaired in the left hand. (Doc. No. 9-2 at 26; Doc. 9-7 at 59.) The ALJ also noted that in January 2007, Dr. Varecka opined that the nonunion of Plaintiff's left humerus did not cause Plaintiff's left arm symptoms, and he recommended that Plaintiff continue activities as tolerated and continue elbow range of motion exercises. (Id.) Furthermore, there is no objective evidence in the record that Plaintiff is completely unable to use his left arm, as he contends. When Dr. Mendiola examined Plaintiff in October 2006, his strength and sensation were normal, his grip strength was intact bilaterally, but his elbow range of motion was severely impaired. (Doc. No. 9-7, at 115-17.) The next month, when Dr. Uhde examined Plaintiff, he could overhead reach

bilaterally, could fully flex his left hand, but could not extend it fully, and could not extend his left arm to neutral, but he could flex to 40 degrees and supinate to 45 degrees. (Id. at 114-15.) Plaintiff then engaged in physical therapy in November and December 2006. (Id. at 83.) In January 2007, Dr. Varecka, an orthopedic specialist, examined Plaintiff and made the following objective findings: sensation decreased to light touch throughout the radial nerve distribution in the left hand; motor weakness (approximately 2/5) in left extensor pollicis longus; strength decreased (3/5) to wrist extensors; left elbow range of motion significantly diminished from approximately 20 to 60 degrees of flexion, indicating a 20 degree flexion contracture; 40 degrees of pronation and supination. (Id. at 110-11.) Finally, Plaintiff was assessed by a physical therapist at MAPS in November 2008, and his motor strength was only slightly decreased in the left upper extremity, sensation was intact, his left elbow range of motion was limited, and his left elbow strength was limited to 3/5 flexion and 3+/5 extension. (Id. at 125-27.) This objective evidence does not support a restriction that Plaintiff is completely unable to use his left arm. Rather, the objective evidence is consistent with the opinions of the state agency consultants that Plaintiff has a limited ability to use his left arm in light work. The fact that Drs. Patey and Salmi were not aware of the nonunion of Plaintiff's left humerus does not change this conclusion, especially because Dr. Varecka, an orthopedic specialist, opined that the nonunion of Plaintiff's left humerus did not cause Plaintiff's left arm symptoms, and he recommended that Plaintiff continue activities as tolerated and continue elbow range of motion exercises. (Id. at 110-11.)

Dr. Mendiola's opinion was based primarily on Plaintiff's subjective complaint of pain, which the ALJ concluded was not entirely credible. In contrast, the opinions of Drs. Patey and Salmi are supported by the objective findings described above. As such, the ALJ did not err in the weight he assigned to the various medical opinions.

## C. RESIDUAL FUNCTIONAL CAPACITY EVALUATION AND HYPOTHETICAL QUESTION

Plaintiff contends the ALJ's hypothetical question, of an individual who could lift twenty pounds occasionally and ten pounds frequently, and has limited use of his left arm, including limited overhead reaching, did not precisely describe Plaintiff's limitations and therefore the VE's testimony was not supported by substantial evidence. Plaintiff asserts it is not clear from the hypothetical question posed to the VE whether Plaintiff can frequently reach, handle, and finger with his left hand. Plaintiff asserts that because the hypothetical did not address this limitation, the VE identified jobs Plaintiff could perform that required frequent reaching, handling and fingering. Furthermore, Plaintiff asserts the objective evidence of his decreased range of motion and strength in his left arm is inconsistent with the ALJ's finding that Plaintiff could use his hands all day. In response, Defendant argues that the ALJ was not required to include restrictions on Plaintiff's reaching, handling and fingering because no examining or treating physician placed such a restriction on Plaintiff.

Residual functional capacity is what a claimant can do despite his or her limitations. 20 C.F.R. § 916.945(a). It is the claimant's burden to prove the RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). In determining an RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007). The RFC must be supported by some medical evidence that addresses the claimant's ability to function in the workplace. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004) (internal citations omitted). Social Security Ruling 96-8p provides:

> [W]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the

> adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

SSR 96-8p, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996).

"A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess whether jobs exist for the claimant." Howard v. Massanari, 255 F.3d 577, 581-82 (8th Cir. 2001) (citing Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996)). In order to constitute substantial evidence, testimony from a VE must be based on a properly phrased hypothetical question. Id.; Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000). A hypothetical question is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Roberts, 222 F.3d at 471; House v. Shalala, 34 F.3d 691, 694 (8th Cir. 1994). While the hypothetical question must set out all of Plaintiff's impairments, the ALJ "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." Howard, 255 F.3d at 582.

In this case, the Court concludes that the ALJ asked a sufficiently precise hypothetical question which took into account all of Plaintiff's limitations that have support in the record. In assessing Plaintiff's RFC, the ALJ properly considered the testimony of Plaintiff's brother, the medical records and physicians' opinions, and Plaintiff's subjective complaints. Further, Defendant is correct that there is no objective evidence in the record that Plaintiff cannot reach, handle, or finger objects with his left hand. Plaintiff had varying degrees of limited range of motion and strength throughout his left arm on various examinations, but no physician opined that he could not reach, handle, or finger. Likewise, Dr. Rabinowitz noted there was no objective reason for Plaintiff to have only 50% grip strength in his left hand. (Doc. No. 9-7, at 60.) With the exception of Dr. Mendiola's short term work restriction, no physician opined that Plaintiff's ability to use his left arm was limited to a certain number of hours in a day.

Nonetheless, the ALJ recognized Plaintiff did not have unlimited use his left arm and therefore assigned an RFC that limited Plaintiff to light work with "limited use of the left arm, including limited overhead reaching." This limitation sufficiently describes the evidence in this case and precludes work that requires full use of the left arm. Furthermore, in the hypothetical question the ALJ posed to the VE, the ALJ described Plaintiff's left arm surgery, his complaint of arthritic pain post surgery, and the results of the consultative examiner's range of motion and strength testing on Plaintiff's left arm and hand. (Doc. 9-2, at 66-67.) The hypothetical question posed to the vocational expert was not improperly vague. Substantial evidence in the record supports the ALJ's RFC finding, and the ALJ did not err at steps four and five of the disability evaluation process in determining that Plaintiff could perform other work that exists in significant numbers in the economy. Nonetheless, the Court recommends remand for further proceedings at step three of the evaluation process because if a claimant meets or equals a listed impairment, the findings at step four and five of the evaluation are irrelevant.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment [Docket No. 10] be **GRANTED as to remand;**

2. Plaintiff's Motion for Summary Judgment [Docket No. 10] be **DENIED to the extent Plaintiff seeks an outright award of benefits;**

3. Defendant's Motion for Summary Judgment [Docket No. 13] be **DENIED**;

4. The case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation pursuant to sentence four of 42 U.S.C. § 405(g).

Dated: July 13, 2010          <u>s/ Susan Richard Nelson                </u>
                                              SUSAN RICHARD NELSON
                                              United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **<u>July 29, 2010</u>**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.